**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al. ex rel.* JOHN STONE,<br><br>    Plaintiffs,<br><br>    v.<br><br>OMNICARE, INC.,<br><br>    Defendant. | No. 09 C 4319<br>Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

In a twenty-four count *qui tam* complaint, Relator alleges that Defendant OmniCare, Inc. submitted false claims to the government of the United States and numerous individual states. Relator was an employee of Defendant, and he further alleges retaliatory discharge for his actions in uncovering Defendant's alleged fraud.

Count I is a claim under 31 U.S.C. 3729(a)(1)(G) for unlawful retention of overpayments under the federal Medicare and Medicaid programs in 2000-2005. The overpayments were rooted in allegedly false or fraudulent claims made by Defendant's pharmacies, later revealed to corporate management through an audit process and yet still retained by Defendant. Count II is brought under the same provision and relates to allegedly retained overpayments made to pharmacies that OmniCare had acquired in the one-year period preceding a 2008 audit. Count III alleges a false claim in connection with OmniCare's alleged illicit stockpiling of the drug Synagis. Count IV alleged a Medicaid pricing scheme.[1] Count V encapsulates the conduct alleged in Counts I-III as fraud on Medicare under the FCA. For clarity's sake I deem its

---

[1]Plaintiff has conceded dismissal of this count.

paragraphs merged into Counts I-III. Counts VI-XXII are claims under twenty-eight state false claims acts. Count XXIII repackages the alleged fraud on the state Medicaid programs described in counts VI-XXII on the basis that the federal government reimbursed the states and was therefore harmed. Count XXIV is the federal retaliation claim.

## I. BACKGROUND

Viewed in the light most favorable to the non-movant, the factual background is as follows. OmniCare, Inc. is the nation's largest provider of pharmaceuticals and related ancillary services to long-term health care institutions, such as assisted living facilities, retirement centers, and hospices. The ancillary services include things such as intravenous and nutrition products, respiratory therapy, and assorted durable medical goods. OmniCare owns and operates these services at facilities in several states. In 2008, Defendant generated roughly 100 million dollars in revenue from these ancillary services, sixty percent - or 60 million dollars - of which came from the government programs Medicare and Medicaid.

Relator worked for the defendant, OmniCare, as Vice President for Internal Audit. In that capacity, he conducted two key audits of OmniCare's Medicare and Medicaid claims, one for claims submitted in 2000-2005 (the "Wave I" audit) and one for claims from 2008 ("Wave II"). Wave I took place in 2007. It consisted of an audit of thirty-nine claims spanning eighteen facilities per year from 2000-05. This number does not reflect all claims, rather it was a "probe sample" audit, which Relator describes in his complaint as "one which lacks random selection such that results could be statistically extrapolated." Its purpose was to inform OmniCare whether systemic problems may exist with respect to claims made on Medicare and State Medicaid and to prompt further claims-level investigation as needed. Relator asserts that Wave I

did, in fact, inform OmniCare of such problems. Relator claims that OmniCare should have inquired further but did not do so. Rather, OmniCare provided a limited repayment to Medicare that did not reflect the full extent of overpayments and falsely proclaimed the federal government to have been made whole. OmniCare allegedly made no repayment to the State Medicaid programs.

Wave II took place in 2008. Wave II repeated essentially the same process as that in Wave I, this time for pharmacies newly acquired by OmniCare. It was limited to the year 2008 and examined thirty claims across fifteen facilities. Relator alleges that Wave II made OmniCare aware of claims and payments made to pharmacies for which there was no substantiation, but that OmniCare took no corrective action in response to Wave II.

Relator further alleges that OmniCare submitted false claims for Medicaid reimbursements with respect to the pediatric drug Synagis. Relator alleges that OmniCare intentionally stockpiled excess amounts of Synagis in contravention of FDA-approved discard instructions. OmniCare would then use the inappropriatelyretained quantities to fill additional prescriptions, all the while purchasing more (essentially unnecessary) Synagis under the pretext that the retained quantities were actually discarded per the label instructions. OmniCare is claimed to have used those purchases as the basis for further Medicare reimbursement.

Relator presented the results of Wave II to OmniCare's Internal Audit committee in a formal document. In the document, he noted "deficiencies" with respect to government claims. In addition to the deficiencies noted in the document, he claims to have verbally stated that the deficiencies resulted in "fraud" on Medicare and State Medicaid programs. Thereafter, OmniCare's CEO is alleged to have told Relator to "begin looking for other employment."

3

Relator claims this none-too-subtle suggestion meant that OmniCare effectively discharged him for lawful conduct that was in furtherance of an FCA action.

II. DISCUSSION

i. Counts I and II - Liability Under the Amended FCA.

Relator's main federal allegation is that Defendant has violated the False Claims Act, as amended in the Fraud Enforcement and Recovery Act ("FERA" or the "amended FCA") of 2009, *see* 31 U.S.C. § 3729(b)(3), and the Patient Protection and Affordable Care Act of 2010 (PPACA). Pub. L. 111-148, 124 Stat. 119.

Relators have clarified through further briefing that their core claim is one under 31 U.S.C. § 3729(a)(1)(G), which establishes that any person who

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

is liable to the United States for a civil penalty. 31 U.S.C. § 3729(a)(1)(G).[2] As amended on May 20, 2009 by FERA, the FCA defines an "obligation" as, among other things, "an established duty, whether or not fixed, arising...from the retention of an overpayment." 31 U.S.C. § 3729(b)(3). Section 3729(a)(1)(G) claims are often characterized as "reverse false claims," as they implicate situations in which the charge is falsehood in paying monies to the United States rather than in securing payment from the government. *See, e.g., United States ex rel. Lamers v. City of Green Bay*, 998 F. Supp. 971 (E.D. Wis. 1998) (interpreting pre-FERA version of FCA).

---

[2]This liability may be pursued, as it is here, by private citizens on behalf of the government under 31 U.S.C. § 3730(b).

There have been two important changes to the FCA and other relevant federal law that are at issue here. The first was the addition of a definition for the term "obligation" as described above. 31 U.S.C. § 3729(b)(3). The second is the enactment of PPACA. This broad health care reform legislation included a provision targeting retention of an overpayment. Specifically, as applies here, § 6402(a) of PPACA states that "[a]n overpayment must be reported and returned...by...the date which is 60 days after the date on which the overpayment was identified." 42 U.S.C. § 1320a-7k(d)(2).

The parties agree that there was no liability for "retention of an overpayment" prior to FERA's amendments to the FCA. *See United States ex rel. Yannacopolous v. General Dynamics*, 636 F. Supp. 2d 739, 752 (N.D. Ill. 2009). Further, the parties agree that the statute did not explicitly address its retroactive effect. Finally, the parties agree that the claims at issue are alleged to have been made in 2000-2005 and 2008.

Where the Relator and Defendant part ways is in how "retention of an overpayment" liability attaches. Defendant claims that because no liability could have attached when the claims were made, applying such liability would work an impermissible retroactive effect. Relator disputes this, claiming that "'retention of an overpayment' constitutes a continuing violation of the False Claims Act." Relator further characterizes this as "the continuing conduct of retention after [May 20, 2009, the effective date of amended FCA]." Under Relator's theory, liability can be pinned down to a specific date, May 22, 2010. This is because PPACA's new 60-day deadline for reporting and returning overpayments went into effect on March 23, 2010 and instantly attached to overpayments retained on that day, including all of Defendant's alleged false claims from 2000-2005 and 2008. In Relator's words, every day Defendant does not pay back those

5

alleged overpayments Defendant continues to be "in possession of government monies to which it [is] not entitled."

The Supreme Court has established a two-part inquiry to determine the permissibility of retroactive application of a statute. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)*; also Labojewski v. Gonzales*, 407 F.3d 814, 818 (7th Cir. 2005). First, the court discerns whether Congress spoke directly on the point of whether the statute should have retroactive effect. *Id.* Prospectivity is the default in the absence of clear Congressional intent to the contrary. *Id.*

Second, if Congress has not clearly spoken, "the court must determine whether the new statute would have retroactive effect, *i.e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. The purpose of this step is to determine whether the presumption against retroactivity is triggered. *Labojewski*, 407 F.3d at 819. The conclusion that a statute has retroactive effect demands a "common sense, functional judgment about 'whether the new provision attaches new legal consequences to events completed before its enactment.'" *Martin v. Hadix*, 527 U.S. 343, 357-58 (1999) (quoting *Landgraf*, 511 U.S. at 270). The touchstones are "familiar considerations of fair notice, reasonable reliance, and settled expectations." *Id.*

Relator and Defendant agree that neither FERA nor PPACA have clear pronouncements about retroactivity. This means that the default presumption against retroactivity has been triggered for both FERA and PPACA. *See Landgraf*, 511 U.S. at 280. Indeed, Relator's theory is that the conduct for which Defendant is liable is continuing. It is an ongoing retention of

6

overpayments. Therefore, I am left to consider whether that theory of liability is viable or whether Defendant is right that any such liability would work an impermissibly retroactive effect.

This question ultimately turns on what constitutes the "relevant retroactivity event." *See Miller v. LaSalle Bank Nat'l Ass'n*, 595 F.3d 782, 788 (7th Cir. 2010) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994) (Scalia, J., concurring)). Here, the relevant retroactivity event must be seen as the moment a person comes to know of overpayments it is retaining. The text of PPACA confirms this conclusion. As described above, PPACA sets the deadline for reporting and returning at 60 days from when the overpayment is "identified." 42 U.S.C. § 1320a-7k(d)(2). Further support can be found in the Senate Report on FERA, which indicates that a "violation of the FCA for receiving an overpayment may occur *once an overpayment is knowingly and improperly retained*, without notice to the Government about the overpayment." S. REP. NO. 111-10, at 15 (2009) (emphasis added).

I find that Relator's theory of liability would create impermissible retroactive effect. Taken at face value, Relator's theory would mean that any claim Defendant has ever made on the United States government would be subject to liability under the FCA, so long as some money from that claim is somewhere in their coffers.

This leaves only the question of when OmniCare became aware of its alleged false claims. On Relator's own theory, the audits made the Defendant aware of its overpayments in 2007 (for the claims audited in Wave I) and 2008 (Wave II). Retention liability was enacted on May 20, 2009. Therefore, because the relevant retroactivity events took place before these prospective amendments, the liability for retention of an overpayment cannot attach. Counts I

and II are dismissed, with prejudice, insomuch as they rely on a retention of overpayment theory under the amended FCA.

ii. Count I and II - Liability Under the Pre-FERA FCA

In the alternative, Relators argue that their allegations plead a violation of the FCA as it was codified before the FERA and PPACA amendments.

Pre-FERA, the FCA imposed civil liability on anyone who "knowingly presents, or causes to be presented, to . . . the United States . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). To establish a so-called "presentment" claim, a plaintiff must prove 1) that there was a false or fraudulent claim; 2) the defendant knew the claim was false; and 3) the defendant presented the claim or caused it to be presented to the United States for payment or approval. *United States ex rel. Fowler v. Caremark Rx, LLC,* 496 F.3d 730, 740-41 (7th Cir. 2007).

The FCA "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)." *Id.* at 740. Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). This is often described as requiring a plaintiff to plead "the who, what, when, where and how" of the alleged fraud. *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 605 (7th Cir. 2005) (quoting *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003)).

Relator's claim under Count I fails to adequately allege a presentment claim. By Relator's own description, both the Wave I and Wave II audits revealed various "document deficiencies," the vast majority of which cite missing or inadequate forms alleged to be required

8

to make proper claims under the Medicare and state Medicaid programs. From there, Relator attempts to allege the fraud by stating that the error rates in the claims was so high that OmniCare "knew or should have known that false or fraudulent claims were being made."

These allegations will not do. The Seventh Circuit has rejected a "gestalt" approach to presentment allegations; rather, a complaint must "identify *specific* false claims for payment or *specific* false statements made in order to obtain payment." *United States ex rel. Wildhirt v. AARS Forever, Inc.*, 2011 U.S. Dist. LEXIS 37122, *9 (N.D. Ill. Apr. 6, 2011) (citing *Garst*, 328 F.3d at 376) (emphasis in original). It is true that the Relator has attached as an exhibit a spreadsheet chronicling document deficiencies at the claims level. But what Relator has not done is effectively articulate how the bare deficiencies resulted in claims on the United States and the individual states that were knowingly false. Relator claims in essence that the sheer volume of deficiencies - the "error rate" - means that the claims must be false and that OmniCare knew or should have known this based on that high rate. Submitting a claim without all the required documentation does not, however, make it false or fraudulent, let alone knowingly so. Moreover, the Seventh Circuit has emphasized that Rule 9 pleadings as applied to the FCA require evidence "*at an individualized transaction level*" that demonstrate the necessary elements of the fraud. *United States ex rel. Fowler v. Caremark Rx, L.L.C.*, 496 F.3d 730, 742 (7th Cir. 2007, *overruled on other grounds*, *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 909-10 (7th Cir. 2009) (emphasis in original). This means that Relator's catalogue of claims with deficient documentation, without more, does not properly support a § 3729(a) allegation.[3]

---

[3]I suspect the designers of statutes that encourage disclosures of overbilling expected that internal auditors would be a prime source of complaints about false claims, but auditors often work on samples - large ones - and they discover flaws in documentation as opposed to actual

Counts I and II are dismissed, without prejudice, as to the pre-FERA theory.

iii. Count III - The Synagis Allegations under the FCA.

Relator alleges fraud on the Nevada Medicaid program through OmniCare's alleged stockpiling of the pediatric drug Synagis. OmniCare counters that the conduct supporting this allegation was duly investigated by the Nevada Department of Justice and that a settlement was reached, concluding the investigation. OmniCare argues that the investigation and settlement therefore triggers the FCA's so-called "public disclosure bar":

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. 3730(e)(4)(A).

While Defendant makes a compelling showing, there is a procedural problem with OmniCare's argument. Their argument rests on a series of exhibits documenting Nevada's investigation and the resulting settlement. OmniCare offered the exhibits on the basis that § 3730(e)(4)(A) sounds in "jurisdiction," and that therefore I may consider facts outside the pleadings. *See Krishnamoorthy v. Ridge*, 2003 WL 21204051 at *1 (N.D. Ill. May 19, 2003) (citing *Grafon Corp. V. Hauserman*, 602 F.2d 781, 783 (7th Cir. 1979)). This is true enough for a 12(b)(1) motion, *see id.*, but for § 3730 "although the statute uses the term 'jurisdiction,' . . . the Supreme Court has held that what we are actually dealing with is an issue of substantive law. *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 494 (7th Cir. 2003).

---

overbilling. Therefore, although internal auditors are "fraud-alert"employees in the legal sense, *see infra* part II.v., as a practical matter it is a lower-level employee dealing with specific transactions who may be more likely to uncover specific bad acts as defined by the FCA.

10

Therefore, to consider OmniCare's exhibits, I would have to exercise my discretion to convert the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d); *see also United States ex rel. Yannacopoulos v. General Dynamics*, 315 F. Supp. 2d 939, 946-47 (N.D. Ill. 2004) (citing *Levenstein v. Salafsky*, 164 F.3d 345, 347-48 (7th Cir. 1998)).

In my discretion, I determine that this count should proceed to summary judgment on the relatively narrow issues of the public disclosure bar and the attendant "original source" exception. In doing so, Rule 12(d) requires me to provide the parties with "a reasonable opportunity to present all the material that is pertinent to the motion." *See id.* The parties are therefore ordered to either present any additional materials they deem relevant or alternatively to confirm that all such materials are before me and that I may rule on Defendant's challenge to the Synagis count under Rule 56.

iv. The State Law Claims

The motion to dismiss Counts VI-XXII is entered and continued. Jurisdiction of these state law claims is premised on 31 U.S.C. § 3732, which states that "[t]he district courts shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under" FCA claims. In the alternative, Relator asserts subject matter jurisdiction on the basis of the federal supplemental jurisdiction statute. *See* 28 U.S.C. §1367.

Depending on the outcome of the Synagis allegation and the ability or inability of the Relator to replead the other core FCA counts, it is possible that all that will remain of this lawsuit after early motions practice is the retaliation claim under 31 U.S.C. § 3730(h). A plaintiff may proceed with claims for retaliatory discharge under the FCA independently of her *qui tam* action. *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004). Indeed, "[a] § 3730(h)

11

retaliatory discharge claim can clearly still proceed even if neither governmental action is taken nor any *qui tam* action is contemplated, threatened, filed, or ultimately successful." *Luckey v. Baxter Healthcare Corp.,* 2 F. Supp. 2d 1034, 1050 (N.D. Ill. 1998). Given the irrelevance of the merits of the underlying fraud claims to the retaliatory discharge claim, my jurisdiction over the state law claims may ultimately fail. I need not decide the issue now.

v. Count XXIV - Retaliatory Discharge

Relator has adequately alleged an FCA retaliation claim. Stone claims that he was constructively discharged in violation of the FCA's anti-retaliation provision when OmniCare's CEO told him to "begin looking for other employment" in response to his audit discoveries. *See* 31 U.S.C. § 3730(h). To succeed on such a claim, a plaintiff must show that 1) his actions were taken in furtherance of an FCA enforcement action; 2) the defendant "knew" that plaintiff was engaged in the protected conduct; and 3) the discharge was at least partly motivated by the protected conduct. *United States ex rel. Batty v. AmeriGroup Ill., Inc.*, 528 F.Supp. 2d 861, 877 (N.D. Ill. 2007). Specific types of employees - called "fraud-alert" employees - are subject to a heightened pleading standard with respect to the notice element. *Fanslow*, 384 F.3d at 484. This is because of the common sense notion that when an employee whose very job is to root out problems with government claims does, in fact, present problematic findings, his employer believes he is doing his job, not warning of a lawsuit. *See Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 945 (7th Cir. 2002).

Relator here is a "fraud alert" employee and is thus subject to a heightened pleading standard with respect to the notice element. *Fanslow*, 384 F.3d at 484. Without citation to any authority or any further explanation, he states that "[a]s Defendant's Vice President of Internal Audit, Relator[] was not responsible for discovering fraud in the normal course of his

employment." This argument is implausible on its face and does not square with multiple cases determining a variety of employees with even lesser connection to fraud investigation to be "fraud-alert" employees. *See, e.g. Brandon*, 277 F.3d 936 (7th Cir. 2002) (shareholder physician in private practice medical group was fraud-alert employee); *Eberhardt v. Integrated Design & Constr., Inc.*, 167 F.3d 861, 865 (4th Cir. 1999) (senior staff vice president); *but see Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d at 479 (information systems technician not fraud-alert employee). Relator's job title, by his own description, was "Vice President of Internal Audit." His task - again by his own description - was to perform "an internal audit...to ascertain whether (Defendant's) Medicare and Medicaid claims for ancillary services were in conformity with Medicare regulations...and respective State Medicaid regulations." It is beyond dispute that an audit described this way would include keeping an eye out for fraud on the government.

 Because I have determined that Relator is a fraud-alert employee, what remains is to determine whether Relator has adequately pled the retaliation count under the heightened pleading standard. He has, if only barely. Relator alleges that he presented a document to OmniCare's internal audit committee reflecting the deficiencies found in the Wave II audit and he stated to the committee that those deficiencies amounted to "fraud" on the Medicare program. In *Brandon*, the Seventh Circuit found that a fraud-alert employee did not satisfy the notice element even though he discovered and presented falsified Medicare bills to his employer, describing them as "illegal," "improper," and "fraudulent." *Brandon*, 277 F.3d at 939. In *Fanslow*, however, the Seventh Circuit noted *Brandon* approvingly and yet described words like "illegal" and "unlawful" as being the very "magic words" that a fraud-alert employee would have to use to put his employer on notice for FCA retaliation purposes. *Fanslow*, 384 F.3d at 484. Here, Relator claims he said "fraud" when turning over his audit reports. If the *Fanslow* dicta is

13

taken at face value, this is enough. Because *Fanslow* is the later case and because this is merely the pleading stage, I determine that Stone has adequately pled a claim under 31 U.S.C. § 3730(h).[4]

III. CONCLUSION

For the foregoing reasons, I order the following:

- Counts I and II are dismissed with prejudice insofar as they argue for liability under the amended FCA. They are dismissed without prejudice insofar as they are pre-FERA allegations.

- The motion to dismiss Count III shall be considered under Rule 56. The parties may submit further information pertinent to the narrow issues highlighted in the memorandum.

- Count IV is dismissed per Relator's concession.

- The motion to dismiss the state law claims is entered and continued.

- The motion to dismiss the retaliatory discharge claim is denied.

ENTER:

James B. Zagel
United States District Judge

DATE: July 7, 2011

---

[4] It is true that recent district court opinions suggest *Brandon* has had more sway. *See, e.g., Wildhirt*, 2011 U.S. Dist. LEXIS 37122 at *9; *United States ex rel. Batty v. Amerigroup Ill., Inc.*, 528 F. Supp. 2d 861, 878 (N.D. Ill. 2007). Nevertheless, the *Fanslow* dicta has not been expressly rejected by the Seventh Circuit.